FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ AUG 23 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
ERIC EVANS,

      *Petitioner*,

    -*against*-

THOMAS GRIFFIN and ERIC
SCHNEIDERMAN,
       ,
      *Respondents*.
-------------------------------X

MEMORANDUM & ORDER

16-CV-5438(KAM)

**KIYO A. MATSUMOTO, UNITED STATES DISTRICT JUDGE:**

      Eric Evans ("petitioner"), currently incarcerated at
Green Haven Correctional Facility in the State of New York,
brings this petition for a writ of habeas corpus pursuant to 28
U.S.C. § 2254. Petitioner challenges his conviction for first-
degree murder on the grounds that the trial court erroneously
admitted the prior testimony of two key witnesses against him,
and that these errors had a substantial and injurious effect on
the jury's verdict. For the following reasons, the court finds
petitioner's claims are without merit and denies his petition.

### BACKGROUND

**I.   The Murder & Police Investigation[1]**

      On October 3, 1999, Andrae Wright ("the victim") was
waiting outside 570 Stanley Avenue in Brooklyn, New York for his

---

[1] The court derived the facts in this section from the portions of the trial
transcript(s) provided by the parties and their submissions to the court in
connection with this action.

1



wife, Debra Meyers Wright ("Wright"), to pick up her children

from a nearby apartment building. (ECF No. 8, Affidavit in

Opposition to Petition for Writ of Habeas Corpus, at 1.) At

around 9:00 p.m., as the victim waited, he was shot and killed

by a then-unknown individual. (*Id.* at 1-2; Tr. at 253.)[2]

Tamara Hightower ("Hightower") heard the shooting,

prompting her to turn towards the scene of the crime. (*Id.* at

382.) Upon turning around, Hightower saw "the passenger door of

[the victim's truck] open[]" and "[a] person jump[] out." (*Id.*

at 382-83.) Hightower did not see this person's face, but she

did notice that this person was wearing "[d]ark colored jeans, a

hoodie jacket, a [fitted] hat, [and] sneakers." (*Id.* at 384-

85.) Hightower estimated this individual as being 5'6" or 5'7"

tall (*id.*) and a "young adult," *i.e.*, not "old," "middle age,"

nor a "teenager" (*Id.* at 430). This individual walked towards

another vehicle, entered that vehicle through the passenger

side, and drove away. (*Id.* at 383-84.)

Sergeant Lisa Velez ("Velez"), an off-duty police

officer, also heard the shooting. (*Id.* at 253.) Velez, who was

then in a nearby building, looked outside of a window and saw a

---

[2] There were two separate trials in this action. Respondent attached portions of the transcripts from both to its response to the petition. Due to the size of these files, however, the transcripts were split into several ECF filings. For ease of reference, the court will cite to the retrial transcript as "Tr.," and will indicate when it cites to other portions of the record, including to the transcript of the initial trial.

male briskly crossing the street. (*Id.* at 254.) Velez described this individual as a dark-skinned male wearing a hat and a grey hoody. (*Id.*) The descriptions provided by both Hightower and Velez, although not detailed, generally matched petitioner. (*Id.* at 706, 899.)

The shooting was called into 9-1-1 at 9:12 p.m. (ECF No. 1-2, Memorandum of Law in Support of Petition for Writ of Habeas Corpus ("Pet'r's Br."), at 16.) The New York Police Department ("NYPD") arrived at the scene shortly thereafter and began investigating. (*Id.* at 136-37.) The NYPD began with the victim's vehicle. They identified no ballistic evidence or ballistic damage in the vehicle. (*Id.* at 137-38.) And though investigators found one bloodstain and some fingerprints in the vehicle, they did not identify a match. (*Id.* at 172-73.)

Detective Kennedy ("Kennedy") arrived at the scene at around 9:15 p.m. and began speaking with witnesses. (*Id.* at 560.) Kennedy spoke with Wright's father, Donald Meyers, and then entered the Meyers' apartment. (*Id.* at 563-64.) Upon entering, Detective Kennedy proceeded to the room where Wright was located, where he found her "sitting on the bed erasing numbers from the caller I.D." (*Id.* at 564.) Wright claimed that "she had spontaneously erased [the deleted numbers from the

caller I.D.] by accident." (*Id.*) Detective Kennedy checked and there were no numbers on the phone. (*Id.* at 564-65.)[3]

Detective Kennedy's investigation led to a search and review of the telephone records of Wright's cell phone and her parents' landlines which, in turn, led to the identification of at least two suspicious telephone numbers. (Pet'r's Br. at 15.) The first number, which was registered to a "Michael Outlaw," placed calls to Wright on August 18, 1999 and October 1, 1999. (Tr. at 511, 518-19.) It also called the grandparents of petitioner's wife, Yolanda Bouyer ("Bouyer"), between September and December 1999. (Pet'r's Br. at 16.) The second number, which was registered to a "Lisa Furnaro," placed several calls to Wright and her parents' phones on the night of the murder between 7:19 and 7:30 p.m., and again at 8:46 p.m. and 8:57 p.m., prior to the murder. (Tr. at 572, 645-48, 656-57.)

Both of these numbers would later be traced back to petitioner. (*Id.* at 861-62.) The trial evidence established that the Furnaro cell-phone account was opened four days before the victim's murder and used to call Wright's cell phone, her home phone, and her parents' home phone several times in the two hours before the murder. (Tr. 634-39, 642-43, 645-50, 815-17.) Investigators would also learn that Wright received calls from a

---

[3] Two of the erased calls had been placed from payphones in the petitioner's neighborhood approximately half-an-hour after the victim's murder. (*Id.* at 521-22, 524, 566-67, 585-86.)

payphone near petitioner's residence on Shore Avenue at 9:46
p.m. of the night of the murder, roughly thirty minutes after
the shooting. (*Id.* at 521-22, 566-67, 585-86, 781-83.) Though
petitioner would admit to making many of these calls, he would
argue they were for innocuous purposes, like to discuss requests
for money or his daughter's birthday party. (*Id.* at 778-80.)

Investigators also questioned Wright regarding her
relationship with the victim. (*Id.* at 897.) Wright initially
described a relatively benign relationship, but it became clear
that this was not the case. (*Id.*) Wright's relationship with
the victim had become strained. (*Id.* at 340-42, 484.) This was
of particular interest, given that the victim then held multiple
life insurance policies, totaling over two-hundred-thousand
dollars, with Wright as the beneficiary. (*Id.* at 541-49.)

Further investigation would also reveal the nexus
between petitioner and Wright. Petitioner and Wright were
previously married for roughly five years. (ECF No. 8-11,
Testimony of Edna Meyers from Defendant's 1st Trial, at 451.)
Although they divorced, petitioner remained a figure in his
children's lives. (*Id.* at 463-64.) Petitioner similarly
maintained a relationship with Wright's mother, Edna Meyers.
(*Id.* at 449-50.)

In 2007, several years after the murder, the
investigation by the Brooklyn District Attorney's Office ("the

prosecution") concluded that petitioner was the unidentified shooter. (ECF No. 8, Aff. in Opp. to Pet. for Writ of Habeas Corpus, at 2.) The prosecution believed that petitioner hatched a plan with the victim's wife, Wright, to kill the victim and share the proceeds of his life insurance policies. (*Id.* at 1-2.) The prosecution thus charged petitioner with first-degree murder under New York Penal Law § 125.27(1)(a)(vi), and lesser included charges, for his alleged role in the victim's murder. (*Id.* at 2.) Petitioner pleaded not guilty, and the parties proceeded to trial in the Supreme Court of the State of New York, Kings County ("the trial court").

## II. The Initial Trial

Petitioner's first trial commenced on May 5, 2009 ("the initial trial"). The prosecution proffered a substantial amount of circumstantial evidence supporting petitioner's guilt, which, in essence, established the facts described above.[4] Most importantly for present purposes, however, the prosecution also elicited direct testimony from two key witnesses who were deemed unavailable at petitioner's subsequent retrial: (1) Jeanevie Sepulveda ("Sepulveda"), petitioner's ex-girlfriend, and (2) Michele Jurden ("Jurden"), petitioner's sister.

---

[4] The parties have not submitted the complete transcript of testimony from the initial trial. Petitioner, however, confirmed in his brief that – except for the testimony of unavailable witnesses – "[t]he . . . evidence presented at the first trial was presented at the second trial." (Pet'r's Br. at 8.)

a. Testimony of Jeanevie Sepulveda

Sepulveda testified to conversations she had with petitioner in which they discussed what appeared to be the alleged murder-for-insurance-proceeds scheme. (*See generally* ECF No. 8-10, Testimony of Jeanevie Sepulveda from Defendant's 1st Trial ("Sepulveda Tr.").) Petitioner was "very vague" about this topic in his conversations with Sepulveda. (*Id.* at 891-92.) He "basically . . . told [her] about an insurance thing that he had with a friend of his and that he didn't get paid for it." (*Id.*) Petitioner also informed Sepulveda that "the scam involved someone by the name of Debbie" (*id.* at 893-94) and required that he "get rid of somebody" (*id.* at 895). Petitioner later specified to Sepulveda that "[h]e talked to [the victim] and he had to shoot [the victim] so he could get the money" – specifically, "[petitioner] said that [he and the victim] were in a car and they were talking[,] and he just shot [the victim]." (*Id.* at 896.)

Sepulveda's testimony included evidence that she had recently started to suffer from schizophrenia. (*See id.* at 882.) Starting in late October 2008, Sepulveda began experiencing auditory hallucinations. (*Id.* at 882-83.) She "heard sounds in [her] brain, like in [her] ear," and she believed that they were real. (*Id.*) As these symptoms persisted, Sepulveda's mother, Jeannette Navarro ("Navarro"),

7

insisted that Sepulveda hospitalize herself for a psychiatric evaluation. (*Id.* at 882.) Sepulveda agreed, and she was hospitalized in January 2009. (*Id.*) During her evaluation, Sepulveda reported feeling "paranoid" and sometimes "nervous," but she claimed that "at the time [her illness] wasn't that big of an issue." (*Id.* at 883-84.) Sepulveda was later released but continued to suffer from these symptoms. (*Id.* at 884.)

David Jacobs, petitioner's defense counsel ("the defense"), cross-examined Sepulveda at length. The defense elicited testimony regarding Sepulveda's mental illness, including which voices she heard, how long she heard the voices on each occasion, and whether she believed them to be real. (*See, e.g., id.* at 910-11.) The defense also questioned Sepulveda's ability to recall the events in question more generally. The cross-examination focused on Sepulveda's drug use, successfully eliciting an admission from Sepulveda that "[she and petitioner] were both really, really high" during the portion of 2001 when she had the conversations with petitioner about his alleged involvement in the murder scheme. (*Id.* at 934.) The defense also emphasized the lapse in time between the 2001 conversations and her testimony in 2009. (*Id.* at 912-13.)

b. Testimony of Michele Jurden

Jurden's testimony, while still helpful, was far less detailed. (*See generally* ECF No. 8-11, Testimony of Michele

Jurden from Defendant's 1ˢᵗ Trial ("Jurden Tr.").) According to Jurden's testimony, petitioner told Jurden that "Debra asked him to kill somebody for her." (*Id.* at 835.) Jurden also "vaguely" recalled petitioner referencing a "policy" as something "he would get in return" for the killing. (*Id.*) Jacobs similarly cross-examined Jurden at the initial trial. (*Id.* at 838-43.)

### c. The Mistrial

Ultimately, after hearing the evidence presented by the prosecution – including the direct, in-person testimony of Sepulveda and Jurden – the jury was hung. (ECF No. 9, Pet'r's Reply Br. ("Pet'r's Rep. Br."), at 5-6.) The prosecution then offered petitioner a sentence of fifteen years, if he agreed to plead guilty. (*Id.* at 11.) Petitioner declined this offer and the parties proceeded to a new trial. (*See id.*)

## III. The Retrial

Petitioner's second trial commenced on April 15, 2010 ("the retrial"). The prosecution's case revolved around the same evidence detailed above.[5] This time, however, the prosecution said it was unable to call Sepulveda and Jurden as witnesses as they were "unavailable" to testify. The trial court consequently held separate hearings to determine whether each witness was unavailable to testify at the retrial.

---

[5] *See supra* note 4.

a. Sepulveda's Unavailability Hearing

The unavailability hearing regarding Sepulveda took place before the retrial began. The prosecution argued that Sepulveda had become unavailable "by reason of death, illness, or incapacity" pursuant to C.P.L. § 670.10(1). (Tr. at 226.) Sepulveda had testified as to her mental state at the initial trial. (ECF No. 8-1, Transcript of Pretrial C.P.L. § 670.10 Hearing (("Pretrial Tr."), at 3.) But the prosecution argued that Sepulveda's mental illness had significantly worsened to the point where she could no longer testify. (*Id.*) Accordingly, the court held an "unavailability hearing" pursuant to C.P.L. § 670.10 to establish whether Sepulveda was "available" to testify as a witness at the retrial.

At this hearing, the prosecution relied primarily on the testimony of Dr. Dolores Perez ("Dr. Perez"), Sepulveda's treating physician. (*Id.* at 7-8.) As background, Dr. Perez explained that around October 2009 – after the initial trial – Sepulveda was admitted to St. Vincent's Hospital for a two-week inpatient treatment program. (*Id.* at 7-9.) Sepulveda was then in an "acute psychotic state," explained by Dr. Perez as a "break from reality." (*Id.* at 10-11.) Sepulveda's symptoms were as follows:

> [S]he had auditory hallucinations telling her to attempt suicide, but that she would survive, God would intervene. A bizarre delusion that she is involved in a government

> sponsored program in which it is like a "Big Brother is
> watching you." They put you under stressful situations,
> and if you survive for fourteen months they then give you
> $1,400.
>
> She wasn't sleeping. She wasn't eating. She was jittery.
> Her family saw her as bizarre, always laughing and giggling
> to herself, and that's the presentation that she had when
> she came to the emergency room with her mom.

(*Id.* at 11.) She also presented a risk of suicide, as she

talked about tying shoe laces around her neck to kill herself.

(*Id.* at 11-12.) Sepulveda gradually improved during her in-

patient treatment, and she was later discharged on the basis

that "[s]he was no longer suicidal," "was able to eat" and

"dress herself," and "agreed to take medications and seek

outpatient treatment." (*Id.* at 12-13.)

Upon discharge, Sepulveda began an outpatient program,

where she was first treated by Dr. Perez. (*Id.* at 13.) Dr.

Perez was aware of Sepulveda's medical history from her medical

records. (*Id.* at 9.) Sepulveda's records explained, among

other things, that there was "a history of suicide in

[Sepulveda's] family." (*Id.* at 14.) This history, as well as

Sepulveda's own suicidal tendencies, concerned Dr. Perez. (*Id.*)

Dr. Perez explained that "[s]tressful situations"

could cause Sepulveda's symptoms to increase. (*Id.* at 16.) For

instance, Sepulveda's "psychotic symptoms worsen[ed] simply by

not being able to clean the bathroom." (*Id.* at 16-17.)

Accordingly, Dr. Perez continued her "process of trying to

11

increase [Sepulveda's] medications" because Sepulveda remained "more psychotic" than before. (*Id.* at 17.)

As the retrial neared, Dr. Perez began to think that Sepulveda was "getting better." (*Id.* at 19-20.) Nevertheless, just three weeks before the retrial, Sepulveda's condition underwent a "drastic change." (*Id.* at 20.) Dr. Perez believed that a phone call from detectives in connection with the retrial triggered Sepulveda's sudden decompensation. (*Id.*) Overall, Dr. Perez testified that Sepulveda's anxiety level would be "very high" if she were forced to testify. (*Id.* at 23-24.)

Moreover, Dr. Perez had concerns about Sepulveda's serious risk of suicide:

> [Sepulveda] has very poor reality testing. She has a difficult time sometimes understanding that they're voices and they are not real. She's at least acted on the hallucinations once by tying the shoe laces around her neck.

> In addition to high risk of suicide, we have a completed suicide with the uncle. You have a new living arrangement which she stayed with her mother and stepfather, which is not the best. The factors are there.

(*Id.* at 24-25.) The court also asked Dr. Perez whether Sepulveda's medications would impact her ability to testify, to which Dr. Perez responded:

> No. Cognitively [Sepulveda] will understand the questions [she is asked] and she will answer them. It depends upon what happens with the auditory hallucinations. I don't think the medications will interfere. I think her psychotic symptoms will interfere, and I am trying to increase her medication to treat her symptoms.

12

(*Id.* at 47.) Finally, the court asked whether Dr. Perez believed that Sepulveda could be fabricating her symptoms. (*Id.*) Dr. Perez did not believe so, stating that Sepulveda is "a genuine bonafide young lady with chronic paranoid schizophrenia." (*Id.* at 47-48.)

The prosecution also called Navarro, who corroborated the deterioration of her daughter's mental state. Navarro testified that Sepulveda indicated the voices in Sepulveda's head were growing louder and more disruptive. (Tr. at 199.) She believed that her daughter's condition had worsened since the initial trial. (*Id.* at 212.) Moreover, Navarro testified that she believed her daughter now provided "unreliable" information. (*Id.*) Importantly, Navarro also confirmed Dr. Perez's opinion that contact with the detectives exacerbated her symptoms. (*Id.* at 201.) After contact, Sepulveda told her mother, "they're back and they are following me. . . I can't do it. I can't. The program will not allow me to speak to anybody. And, they would hear, mom, they would hear." (*Id.*)

The defense, however, argued that Sepulveda's condition remained essentially the same as it was prior to the initial trial. The defense stressed that many of the conditions present now were also present before the initial trial; for instance, the history of suicide. (*See, e.g.*, Pretrial Hrg. Tr. at 40.) The defense also argued that Dr. Perez did not actually

13

discuss the possibility of testifying with Sepulveda in an attempt to undercut Dr. Perez's testimony that it would be very stressful for Sepulveda to testify. (*Id.* at 45-46.) But Dr. Perez appears to have disagreed:

> [The] best predictor of the future is the past, and if [Sepulveda] decompensated with one phone call from the detective and the ADA to the point where the voices [in her head] are louder, she's agitated, she's anxious [and] she can't think straight, I can only speculate that it would be more problematic if she had to come into the courtroom.

(*Id.*) Testifying, Dr. Perez testified, would "absolutely" be a stressor for Sepulveda. (*Id.* at 46.) Still, the defense argued that Sepulveda was essentially functioning, albeit with serious deficiencies, and should still be required to testify in person at the retrial. (*See, e.g.*, Tr. at 220.)

The trial court found both of the prosecution's witnesses credible. (*Id.* at 225.) Relying on their testimony, the trial court found that "it [was] clear that [Sepulveda] [was] mentally ill. She ha[d] a serious mental illness. The illness [was] so serious that she ha[d] been hospitalized twice within the past two years . . . ." (*Id.* at 226.) Moreover, "the mental condition of [Sepulveda] ha[d] definitely deteriorated from the last time she testified." (*Id.* at 229.) "[Sepulveda] [was] suffering a much more advanced condition of schizophrenia and voices that she [was] hearing [were] . . . impacting her life in a much worse way and the fact that she had

to have been hospitalized for two weeks after she testified in
[the initial trial] . . . [was] indicative of that
deterioration." (*Id.* at 229-30.)

In sum, the trial court concluded that it was "obvious
. . . that [Sepulveda] would not be able to give competent
testimony [in the retrial]." (*Id.* at 230.) The trial court
found the evidence "overwhelming that her mental health would be
seriously jeopardized" if she were required to testify, and that
her mental illness would impact the validity of her testimony.
(*Id.*) Finding that Sepulveda was unavailable, and that the
defense had cross-examined Sepulveda at the first trial, the
court deemed Sepulveda's prior testimony admissible at the
retrial. (*Id.* at 246.)

　　b. The Mid-Trial Sirois[6] Hearing

The unavailability hearing regarding Jurden occurred
during the retrial. The prosecution called Jurden as a witness.
(*Id.* at 603.) But when Jurden appeared, she claimed to have had
a lapse in memory. (*Id.* at 609.) Jurden claimed this resulted
from, *inter alia*, medications she was taking. (*Id.*) The
prosecution, however, argued that Jurden's claimed memory lapse

---

[6] "[A] *Sirois* hearing [is] a hearing held in New York criminal cases to
determine whether the defendant has procured a witness's absence or
unavailability through his own misconduct, and thereby forfeited any hearsay
or Confrontation Clause objections to admitting the witness's out-of-court
statements." *Cotto v. Herbert*, 331 F.3d 217, 225-26 (2d Cir. 2003) (citing
*People v. Geraci*, 85 N.Y.2d 359 (1995)).

15

was the product of petitioner's wrongful procurement, and it

thus argued that the court should admit Jurden's prior trial

testimony. (*Id.* at 617.)[7]  The court consequently held a *Sirois*

hearing, outside the presence of the jury, to determine whether

Jurden's claimed lapse in memory was a product of the

defendant's wrongful procurement. (*See generally id.*)

The prosecution presented recorded conversations

between petitioner and others as evidence supporting its

allegations of wrongful procurement.  Two conversations took

place between Jurden and petitioner just after Jurden had

testified in the initial trial, and while petitioner was

incarcerated at Rikers Island.[8]  (Pet'r's Br. at 17-19.)  In the

first call, petitioner angrily told Jurden that he did not "know

where [she] came [up] with this story [about Wright's request to

kill her husband]." (*Id.* at 18.)  Petitioner also told Jurden

that she could have said, "I don't know anything and don't want

to get involved.  That's all you had to say." (*Id.*)  In the

---

[7] Initially, the prosecution sought to admit Jurden's grand jury testimony.
(Tr. at 615.)  The defense objected, arguing that Jurden already testified
and was cross-examined in the initial trial. (*Id.* at 617.)  The court
agreed, and it consequently limited the *Sirois* hearing to the question of
whether it should admit Jurden's initial trial testimony. (*Id.* at 620.)

[8] The record is not entirely clear on the exact dates of these conversations.
Petitioner's brief states that "[t]he People offered a CD with the recordings
of two telephone conversations between petitioner and his sister, taped at
Riker's Island, one on May 28, 2009, and the other on June 7, 2009, during
his first trial one year earlier." (Pet'r's Br. at 17-18.)  Respondent, on
the other hand, cites both conversations as taking place on May 28, 2009.
(Resp't's Br. at 9.)  Neither of the conversations was transcribed into
evidence, so this Memorandum and Order reflects the parties' descriptions of
the conversations at issue.

second call, petitioner complained to Jurden that her testimony
"implicated [him] with [Wright] with some nonsense." (Resp't's
Br. at 9.)  The court found that petitioner was "very harsh with
his sister, yelling at her at times during the conversation, and
expressing extreme anger that she had come in and testified"
against him.  (Tr. at 686.)

The prosecution also read part of a transcript of a
conversation between petitioner and Yolanda Bouyer ("Bouyer"),
petitioner's ex-girlfriend, dated May 28, 2009.  (Tr. at 679.)
Petitioner told Bouyer that "you got to let [Jurden] know . . .
your brother was coming home, but now he, they going to f[…]
around and send him away for the rest of his life.  He ain't
going to see his sons because of you when you should have just
f[…]'n minded your f[…]'n business."  (Id.)  Petitioner then
told Bouyer, "really let [Jurden] know . . . if they sentence
[her] brother, it's because of [her]."  (Id.)

Finally, the prosecution read to the court portions of
transcripts of conversations between petitioner and his mother –
dating from June 2009 through March 2010 – in which petitioner
continued to vent his frustrations about the fact that his
sister, Jurden, testified against him.  (Id. at 680.)  In one
conversation, dated June 2, 2009, petitioner explained to his
mother that he faulted his sister for not "mind[ing] her
business."  (Id.)  In another, dated September 9, 2009,

petitioner suggested to his mother that Jurden could have remained silent. (*Id.* at 681.) Finally, in March 2010, shortly before the retrial, petitioner stressed to his mother the importance of Jurden's testimony to the prosecution's case. (*Id.* at 680-81.)

The defense argued that these conversations merely demonstrated petitioner's understandable frustration with the situation. (*Id.* at 682-83.) Defense counsel argued that petitioner's conversations did not establish that petitioner specifically intended to procure Jurden's silence. The defense also argued that the court would need more context to determine the cause of Jurden's memory lapse. (*Id.* at 683-84.)

The trial court found the prosecution's arguments and evidence more compelling on the issue of Jurden's availability, or lack thereof, at the retrial. Although petitioner might not have explicitly threatened Jurden in the recorded conversations between them, his tone was consistent with an intent to intimidate his sister into silence. (*Id.* at 685.) Moreover, the court remarked:

> [T]here is . . . no doubt that [petitioner] proposed the very plan that [Jurden] executed here today, which is to have a lapse of memory. That idea came from him, and that I think is a very important factor in evaluating what went on in this case.

(*Id.* at 686-87.) The trial court concluded that the prosecution had proved by clear and convincing evidence that petitioner had

prevented Jurden from testifying.  (*Id.* at 687.)  The trial court thus admitted Jurden's prior trial testimony based on petitioner's wrongful procurement of his sister's purported memory lapse.  (*Id.* at 687-88.)  The trial court also explicitly stated that its ruling relied exclusively on the recorded conversations it heard.  (*See id.* at 689.)

    c. The Verdict

In accordance with the foregoing rulings, the judge and court reporter read the transcript of Sepulveda's and Jurden's testimony from the initial trial to the jury.  (Pet'r's Br. at 19.)  The prosecution also presented evidence tending to establish the facts described in more detail above.  The prior witness testimony, however, appears to have been quite important to the jury - during their deliberations, the jury sent a number of notes, including notes asking to review the "cross-examination of the defendant," "Michele Jurden's testimony," "Ms. Sepulveda's testimony," and for a second time, Jurden's direct testimony.  (*See, e.g., id.* at 927A, 940.)  After considering the evidence at the retrial, the jury unanimously found petitioner guilty of first-degree murder.  (*Id.* at 942-43.)  The court consequently dismissed the jury, and later sentenced petitioner to life imprisonment without the possibility of parole.  (ECF No. 8-9, Sentence Minutes, at 29.)

## IV. PROCEDURAL HISTORY

### a. The Appellate Division

Petitioner appealed his conviction to Supreme Court of the State of New York, Appellate Division, Second Judicial Department (hereinafter, "the Appellate Division"). (*See generally* ECF No. 8-13, Defendant's Main Appellate Brief Pursuant to His Direct Appeal of His Conviction ("App. Br.").) Petitioner argued, *inter alia*, that the trial court erred by admitting Sepulveda and Jurden's testimony based on "unavailability." The Appellate Division disagreed as to both witnesses. *See generally People v. Evans*, 127 A.D.3d 780 (N.Y. App. Div. 2015).

*First*, petitioner challenged the admission of Sepulveda's testimony on the basis that she was "not psychologically unavailable" to testify. (App. Br. at 39.) Petitioner contended that the increased anxiety or worsening of symptoms was not enough to establish unavailability under § C.P.L. 670.10. (*Id.*) Rather, petitioner argued that the prosecution was required to show that testifying would "seriously jeopardize" the witness's health. (*Id.* at 40.) In this case, petitioner claimed there was "absolutely no evidence that testifying anew would 'seriously jeopardize' [Sepulveda's] health." (*Id.* at 41.) He relied on the fact that Sepulveda

"was schizophrenic at the time of the first trial" yet still "testified without serious impact on her health." (*Id.*)

The Appellate Division found petitioner's argument unpersuasive and noted that C.P.L. § 670.10(1) "authorizes the use of prior trial testimony where a witness is unavailable due to 'illness or incapacity.'" 127 A.D.3d at 782. The Appellate Division concluded that this standard "was [met in Sepulveda's case] by evidence of [Sepulveda's] severe mental illness and suicidal tendencies." *Id.*

*Second*, petitioner challenged the admission of Jurden's testimony on the basis that the prosecution did not prove, by clear and convincing evidence, that petitioner had threatened Jurden not to testify. (App. Br. at 44.) Petitioner argued that the evidence presented did not establish that any threats were made against Jurden, let alone clear and convincing evidence. (*Id.*) Specifically, petitioner characterized the recorded conversations as evidence of his frustration with the prosecution's alleged misuse of Jurden's testimony. (*Id.*) Moreover, petitioner claimed, the conversations between petitioner and Jurden all took place before it was clear there would be a mistrial. (*Id.* at 45.)

The Appellate Division found this argument similarly unavailing. *Evans*, 127 A.D.3d at 781. The Appellate Division stated that "[a] witness's testimony in a previous proceeding

may be admitted as part of the [prosecution's] where [the prosecution] 'demonstrate[s] by clear and convincing evidence that the defendant, by violence, threats or chicanery, caused [the] witness's unavailability.'" *Id.* Furthermore, the Appellate Division stated that "[b]ecause of the inherently surreptitious nature of witness tampering[,] circumstantial evidence may be used to establish, in whole or in part, that a witness's unavailability was procured by the defendant." *Id.* (internal quotation marks omitted). Applying this standard, the Appellate Division found that the trial court "properly determined that the defendant used his close relationship with his sister to persuade or pressure her into not testifying against him at the retrial." *Id.*

Petitioner also argued that both alleged errors were not harmless. (App. Br. at 46.) Petitioner pointed to the fact that the evidence presented at both trials was substantially similar. (*See id.*) The only real difference, he said, was that the first jury – which was hung – was able to assess the credibility of Sepulveda and Jurden in real-life, while the second jury – which convicted petitioner – only heard a cold reading of their testimony, without the ability to assess the witnesses' credibility by viewing them in person. (*Id.* at 46-47.) The Appellate Division, which found that the trial court

did not err, does not appear to have addressed this point in detail. *See generally Evans*, 127 A.D.3d 780.

### b. The Court of Appeals

Petitioner sought leave from the New York State Court of Appeals ("Court of Appeals") to appeal the decision of the Appellate Division. (ECF No. 8-12, Defendant's Leave Application to the State Court of Appeals.) The Court of Appeals denied petitioner's request on July 13, 2015. *People v. Evans*, 25 N.Y.3d 1201 (2015).

### c. The Present Petition

On September 29, 2016, petitioner timely[9] filed the instant petition seeking a writ of habeas corpus from this court pursuant to 28 U.S.C. § 2254. Petitioner again challenges the trial court's admission of Sepulveda's and Jurden's prior trial testimony as violating his rights under the Sixth Amendment's Confrontation Clause.

---

[9] Title 28 U.S.C. § 2244(d)(1) provides that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." This period runs from the latest of, among other dates, "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." *Id.* § 2244(d)(1)(A). The Court of Appeals denied petitioner's leave on July 13, 2015. *People v. Evans*, 25 N.Y.3d 1201 (2015). Petitioner's conviction accordingly became "final" when the "ninety-day period to seek direct review from the [U.S.] Supreme Court by way of certiorari expired." *Valverde v. Stinson*, 224 F.3d 129, 132 (2d Cir. 2000). This means that petitioner's judgment became final on October 11, 2015, giving him until October 11, 2016 to file this petition. Petitioner filed this petition on September 26, 2016, rendering it timely.

## LEGAL STANDARD

Pursuant to 28 U.S.C. § 2254, "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The application shall not be granted to any claim adjudicated on the merits in State court proceedings unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the [United States Supreme Court]" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## DISCUSSION

Petitioner filed the instant petition for a writ of habeas corpus to vacate and set aside his conviction for murder in the first degree under New York Penal Law § 125.27(1)(a)(vi). Petitioner argues that a writ is warranted because the trial court improperly admitted the prior testimony of both Sepulveda and Jurden. Respondent argues that the state court did not err in admitting these witnesses' prior trial testimony, and

accordingly that petitioner merits no habeas relief pursuant to 28 U.S.C. § 2254.

## I.   Deferential AEDPA Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under AEDPA, "a district court may grant relief only if the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the [United States Supreme Court]," *id.* § 2254(d)(1), or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2)." This standard is "intentionally difficult to meet." *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015).

In reviewing a state court's determination, the habeas court must presume all of the state court's factual determinations to be correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. *Id.* This presumption is particularly important when reviewing the trial court's assessments of witness credibility. *See Parsad v. Greiner*, 337 F.3d 175, 181 (2d Cir. 2003) (presumption of

correctness is particularly important when reviewing trial court's assessment of witness credibility).

Moreover, although challenges under both subsections of § 2254 are directed at the state court's *decision*, *id.* § 2254(d) (providing relief where the state court's adjudication "resulted in a *decision*" that was inappropriate under the relevant standards), each applies to a distinct set of circumstances. Thus, petitioner's burden of proof will turn on which subsections he relies on for his arguments.

    a.   <u>28 U.S.C. § 2254(d)(1)</u>

Under § 2254(d)(1), a federal habeas court may grant relief only if a state court's decision is "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the [United States Supreme Court]." The threshold question is therefore whether the petitioner "seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). The United States Supreme Court has interpreted "clearly established Federal Law" to mean "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Id.* at 412. The court must strictly abide by these principles and not "refine or sharpen a general principle of [United States] Supreme Court jurisprudence

into a specific legal rule that [the United States Supreme] Court has not announced." *Lopez v. Smith*, 574 U.S. 1, 4 (2014).

Once this threshold question is satisfied, the court must then consider which clause of § 2254(d)(1) the petitioner invokes. This is a critical inquiry as each of these clauses has a distinct and independent meaning. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

On the one hand, a state court's decision is "<u>contrary to</u>" clearly established federal law if either (1) "the state court applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases," or (2) "the state court confronts a set of materially indistinguishable facts from a decision of [the United States Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Lockyer v. Andrade*, 538 U.S. 63 (2003); *see also Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within [the] 'contrary to' clause.").

On the other hand, a state court's decision constitutes an "<u>unreasonable application</u>" of clearly established federal law where the state court "identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to

the facts of [a] prisoner's case." *Williams*, 529 U.S. at 413.

Under this standard, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). There must be "no reasonable dispute that [the state court was] wrong." *Woods*, 135 S. Ct. at 1376.

      b.   <u>28 U.S.C. § 2254(d)(2)</u>

Under § 2254(d)(2), a federal habeas court may grant relief where the state court's determination "was based on an *unreasonable determination of the facts* in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added). The United States Supreme Court has looked to whether the evidence "can fairly be read to support the [trial court's] factual determination[s]." *Wood v. Allen*, 558 U.S. 290, 301–02 (2010). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.* at 301. "Where '[r]easonable minds reviewing the record might disagree' as to the relevant finding, that is not sufficient to supplant the state court's factual determination." *Cardoza v. Rock*, 731 F.3d 169, 178 (2d Cir.

2013) (quoting *Rice v. Collins*, 546 U.S. 333, 341-42 (2006)).

Rather, a "state court's finding might represent an 'unreasonable determination of the facts' where, for example, reasonable minds could not disagree that the trial court misapprehended or misstated material aspects of the record in making its finding, or where the court ignored highly probative and material evidence." *Id.* (citing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003); *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003)). This is a high bar to meet.

### c. Harmless Error

Finally, if a petitioner successfully establishes that the state court's decision was a violation within the meaning of § 2254(d), he must then show that the violations constituted more than harmless error. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). Specifically, the petitioner must establish that the violation(s) had a "substantial and injurious effect or influence in determining the jury's verdict" which resulted in "actual prejudice." *Id.*

## II. The Confrontation Clause Analysis

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. There is, however, "an exception to the confrontation requirement where a witness is unavailable

and has given testimony at previous judicial proceedings against the same defendant which was subject to cross-examination by that defendant." *Barber v. Page*, 390 U.S. 719, 722 (1968); *see also Crawford v. Washington*, 541 U.S. 36 (2004); *Washington v. Griffin*, 876 F.3d 395, 404 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 2578 (2018) ("[T]he Confrontation Clause prohibits admission at trial of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him."). As this court recently explained:

> The [United States] Supreme Court authority on the use of prior witness testimonial statements in a manner consistent with the Confrontation Clause is fairly well-established: (a) a witness must be unavailable if the prosecution wants to use her prior statements; (b) if her prior statements consist of previously confronted (cross-examined) testimony, no more is required for admission than her unavailability; (c) if her prior statements consist of non-confronted testimonial evidence, like statements to the police during an investigation or testimony before a grand jury, then those statements will be admissible only if she is unavailable and the defendant caused her unavailability.

*Breazil v. Superintendent Artis*, 15-cv-1912(BMC), 2015 WL 9581816, at *4 (E.D.N.Y. Dec. 30, 2015) (citing *Giles v. California*, 554 U.S. 353, 358 (2008); *Crawford*, 541 U.S. at 68; *California v. Green*, 399 U.S. 149, 165 (1970)).

Petitioner does not contest the propriety of the foregoing principles. Rather, petitioner challenges the trial court's findings that Sepulveda and Jurden were "unavailable,"

30

grounds already addressed on the merits and rejected by the Appellate Division. As these grounds have already been adjudicated on the merits,[10] the deferential AEDPA standard applies to the analysis of petitioner's claims. The court finds that petitioner's contentions do not satisfy the requirements of AEDPA. The court thus lacks a basis to grant petitioner habeas relief, and petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is consequently denied.

### a. Sepulveda's Unavailability Due to Mental Illness

The United States Supreme Court has recognized that a witness may be unavailable for purposes of the Confrontation Clause where he or she is "insane, or sick and unable to testify." *Motes v. United States*, 178 U.S. 458, 474 (1900); *see also D.C. v. Arms*, 107 U.S. 519 (1983); *Reg. v. Thompson*, 13 Cox Criminal Cases ("Cox C.C.") 181 (1876); *Reg. v. Day*, 6 Cox C.C. 55 (1952); *Reg. v. Hill*, 5 Cox C.C. 259 (1851). Moreover, mental illness may render a witness unavailable for incompetence where it affects his or her ability to understand the oath. *See D.C.*, 107 U.S. 519. The admissibility of the prior testimony in such cases is based on a theory of necessity. *Barber*, 390 U.S. at 722. Thus, the United States Supreme Court has considered the gravity of the impact of the proposed testimony on the

---

[10] An "adjudication on the merits" is one that "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(d)).

witness in determining whether the witness is unavailable. *See, e.g., Day*, 6 Cox. C.C. at 56; *Thompson*, 13 Cox C.C. at 181.

In this action, the trial court properly found that Sepulveda was unavailable due to her mental illness. The trial court found both that testifying would seriously jeopardize Sepulveda's health, and that Sepulveda's mental illness meant that she would not provide reliable testimony. Furthermore, the defense had an opportunity to cross-examine Sepulveda in great detail at the initial trial. Accordingly, the admission of Sepulveda's trial testimony from the initial trial was consistent with the Confrontation Clause. *See Giles*, 554 U.S. at 358 (holding that prior testimony is admissible if the witness is unavailable and the defense previously confronted the witness on this prior testimony).

Nevertheless, petitioner argues that the trial court's finding that Sepulveda was unavailable due to mental illness: (1) was "contrary to" well-established federal law; (2) constituted an "unreasonable application of" well-established federal law; and (3) relied on an "unreasonable determination of the facts." Each argument relies principally on petitioner's allegation that Sepulveda's symptoms were only slightly worse at the time of the retrial than they were during the initial trial. Based on the record, however, this court disagrees with petitioner's contentions.

*First*, petitioner argues that the trial court's finding that Sepulveda was unavailable due to mental illness ran contrary to well-established United States Supreme Court precedent. (Pet'r's Br. at 37 (relying on the United States Supreme Court's decision in *Reg. v. Thompson*, 13 Cox C.C. 181).) Petitioner believes the trial court applied the wrong standard in assessing unavailability. (*Id.* at 37.) Specifically, petitioner alleges that the trial court was required to determine "whether [Sepulveda's] attendance would have a serious impact on her health," which he claims it did not do. (*Id.*) Though the evidence established that Sepulveda was schizophrenic (*id.* at 33), petitioner claims there was "no evidence that testifying anew would have any lasting impact on, let alone seriously jeopardize, [Sepulveda's] health," (*id.* at 37).

Petitioner is incorrect in asserting that the trial court did not apply this standard. The trial court explicitly found there "[was] no doubt . . . that the evidence is overwhelming that [Sepulveda's] mental state would be seriously jeopardized" if she were required to testify. (Tr. at 230.) The trial court reached this conclusion after hearing testimony – from witnesses it found credible – that the prospect of playing a role in the trial *alone* seriously and adversely impacted Sepulveda's mental health. Moreover, the trial court heard testimony indicating that requiring Sepulveda to testify

would likely cause her to become more stressed (Pretrial Tr. at 45-46), and that she was already at a high risk of suicide (*id.* at 24-25). At least one of these arguably suicidal instances occurred between the first and second trials. (*Id.* at 11-12.) Against this backdrop, the trial court properly concluded that requiring Sepulveda to testify would seriously jeopardize her mental health, rendering her unavailable and her testimony admissible. *See Giles*, 554 U.S. at 358.

Furthermore, none of the cases petitioner cites presents a materially indistinguishable set of facts. In *Reg. v. Thompson*, 13 Cox C.C. 181 (1876), the court considered the availability of a witness with a "highly nervous disposition" and risk of apoplexy but, unlike here, with "no actual disease or illness, only a predisposition to it." *Id.* at 182. And in *Reg. v. Day*, 6 Cox C.C. 55 (1852), the court considered the availability of an ill witness based on her inability to travel. None of the cited cases involve a schizophrenic witness at high risk of suicide who decompensated rapidly simply by speaking with detectives prior to her planned testimony.

Petitioner similarly argues that the trial court's finding that Sepulveda lacked the capacity to testify was contrary to well-established United States Supreme Court precedent. (Pet'r's Br. at 37 (relying on the United States Supreme Court's decision in *D.C. v. Arms*, 107 U.S. 519).) He

argues that the trial court "had to determine whether Sepulveda had a sufficient understanding to apprehend the obligation of the oath, and was capable of giving a correct account of the matters which she has seen or heard in reference to the questions at issue." (*Id.* at 37-38 (citing *D.C.*, 107 U.S. at 521-22).) Petitioner claims that the evidence did not show that Sepulveda could not understand the oath. (*Id.* at 38.) In fact, petitioner alleges that the evidence demonstrated that Sepulveda would "understand the questions and . . . answer them." (*Id.*)

This court finds petitioner's argument unavailing. *First*, the United States Supreme Court's decision in *D.C. v. Arms* establishes that a witness's testimony can be admissible even if that person is mentally ill, so long as that person can properly testify. *D.C.*, 107 U.S. at 521-22. Lack of comprehension of the oath may provide an alternative basis for a witness's unavailability; it does not, however, provide that a witness is automatically available simply because she can understand and comprehend an oath. *See id.* Moreover, the evidence clearly showed that Sepulveda would struggle to produce reliable testimony. "[T]he competency of a witness to testify before a jury is a threshold question of law which lies exclusively in the trial court's discretion." *United States v. Gerry*, 515 F.2d 130, 137 (2d Cir. 1975). Here, the trial court heard testimony from Dr. Perez that Sepulveda's psychotic

symptoms would interfere with her testimony (Pretrial Tr. at 47), and testimony from Sepulveda's mother that she found Sepulveda to provide "unreliable information" (Tr. at 212). The trial court consequently cannot be said to have erred in concluding that Sepulveda would not produce competent testimony.

Additionally, petitioner again relies on distinguishable cases. For instance, in *Reg. v. Hill*, 5 Cox C.C. 259 (1851), the witness at issue was a patient in an infirmary who suffered from serious delusions and believed that "he ha[d] a number of spirits about him, which are continually talking to him." However, an attendant who worked at the infirmary testified that he "believe[d] the witness to be quite capable of giving an account of any transaction that happened before his eyes" and said that "[w]hen [he] . . . had conversations with [the witness] on ordinary subjects, [he] found him perfectly rational." *Id.* at 260. This is a far cry from Sepulveda's many psychotic episodes, including auditory hallucinations, and suicidal ideations, described in great detail in the testimony of both Dr. Perez and Navarro.

*Second*, petitioner argues that the trial court's finding of Sepulveda's unavailability involved an unreasonable application of United States Supreme Court precedent under § 2254(d)(1). (Pet'r's Br. at 38.) Petitioner argues that the state court's decision was objectively unreasonable as follows:

> [I]f a witness suffers from a mental illness and there is
> evidence that testifying anew would seriously jeopardize
> her health, the witness is unavailable. If, as a result of
> mental illness, the witness does not understand the oath
> and cannot remember the facts, that witness is also
> unavailable. Here, Sepulveda testified at the first trial
> under oath with no apparent negative impact on her health.
> Her condition was essentially unchanged. Stress would
> exacerbate her symptoms such as her flat affect and
> monotonous speech . . . but there was nothing to suggest
> that the stress would last beyond her testifying or that
> she could no longer understand the oath.

(*Id.*)

Again, petitioner is incorrect. The trial court's
finding that requiring Sepulveda to testify would seriously
jeopardize her health did not represent an unreasonable
application of United States Supreme Court precedent. It is
entirely reasonable for the trial court to have reached its
conclusion based on the credible testimony of Sepulveda's
psychiatrist and mother. These witnesses' testimony
demonstrated that Sepulveda decompensated markedly after being
contacted by the detectives. The subsequent, sudden worsening
in Sepulveda's condition supports the reasonable conclusion of
the trial court that testifying would present an even greater
risk to Sepulveda's mental health. This is particularly the
case in light of the fact that Sepulveda had a history of
suicide in her family, that Sepulveda had a history of suicide
attempts (or near attempts) of her own, and that Sepulveda would
likely have high anxiety from testifying.

Moreover, the trial court's determination that Sepulveda could not provide competent testimony is similarly not unreasonable. The evidence established that Sepulveda suffered from increasing schizophrenic symptoms. Sepulveda's hallucinations and delusions, for instance, caused her to suffer from "poor realty testing," where she had a difficult time understanding that the voices she was hearing were not real.[11] Furthermore, Sepulveda believed that she was in a game of "big brother," and that participating would ultimately lead to a prize. While petitioner quotes an excerpt from Dr. Perez's testimony noting that Sepulveda's medications would not interfere with her testimony, he overlooks Dr. Perez's subsequent statement (made immediately thereafter) that Sepulveda's psychotic symptoms would affect her testimony. In light of the evidence before the trial court, it was not unreasonable to conclude that Sepulveda's mental illness would prevent her from producing competent testimony.

---

[11] "[T]he competence of a witness depends upon 'a capacity to observe, to remember, to communicate and to understand the nature of an oath and the duty it imposes to tell the truth.'" *Lopez v. Meluzio*, 2006 WL 3833115, at *3 (citing *United States v. Bloome*, 773 F. Supp. 545, 546 (E.D.N.Y. 1991)). In *Meluzio*, the court found that the defendant's cerebral palsy did not render him unavailable because he understood the "physical and mental rigors" of a deposition and the oath. *Id.* at *2, *3. Furthermore, the court found that the defendant's "slower than average" ability to communicate was due to physical impairments arising out of his cerebral palsy, and not the result of any inability to understand questions and to frame answers. *Id.* at *5. Here, unlike in *Meluzio*, Sepulveda's schizophrenia has affected her ability to provide reliable testimony, as evidenced by the testimony of Navarro that she found her daughter unreliable, and by Dr. Perez's testimony that Sepulveda's psychotic symptoms would interfere with her testimony.

*Finally*, petitioner argues that the trial court's finding of Sepulveda's unavailability involved an "unreasonable determination of facts" under § 2254(d)(2). (Pet'r's Br. at 39.) Specifically, petitioner alleges that the trial court "erroneously equated exacerbated symptoms with serious impact [on] Sepulveda's health." (*Id.*) Petitioner further argues that there was "absolutely no basis for the court's finding that Sepulveda could not understand the oath," as she testified under oath at the first trial without incident. (*Id.*)

Petitioner is incorrect. To begin, there was sufficient evidence to establish that requiring Sepulveda to testify at the retrial would seriously jeopardize her health. The trial court did not conflate exacerbated symptoms with a serious risk to Sepulveda's health. Rather, it considered the risks Sepulveda faced as a result of her illness (i.e., a high risk of suicide and increased psychosis) in the context of Sepulveda's worsening condition, and in particular the prospect that Sepulveda would likely have high anxiety and decompensate again were she to testify.

Petitioner's bare assertion that there was "absolutely no evidence for the court's finding that Sepulveda could not understand the oath" is also unsupported and unavailing. Dr. Perez and Navarro explained Sepulveda's inability to differentiate fact from fiction. They also demonstrated that

Sepulveda's symptoms had only worsened since the first trial. Moreover, Dr. Perez expressly indicated that Sepulveda's psychotic symptoms would interfere with her ability to testify. This court therefore cannot conclude that, in light of the evidence presented, the trial court's determination that Sepulveda was unavailable due to mental illness was based on an unreasonable determination of the facts.

### b. Jurden's Unavailability Due to Wrongful Procurement

The United States Supreme Court has held that a witness may be unavailable for purposes of the Confrontation Clause due to a defendant's wrongful procurement. *Giles*, 554 U.S. at 359; *Reynolds v. United States*, 98 U.S. 145, 158 (1878); *Cotto v. Herbert*, 331 F.3d 217, 249-50 (2d Cir. 2003). This doctrine arises from the notion that "no one should be permitted to take advantage of his wrong." *Giles*, 554 U.S. at 366 (citing *Reynolds*, 98 U.S. at 159). Accordingly, such forfeiture occurs "if the defendant has in mind the particular purpose of making the witness unavailable." *Giles*, 554 U.S. at 367; *see also id.* at 359 (finding that the common law exception for wrongful procurement applied "where the defendant had engaged in wrongful conduct designed to prevent a witness's testimony"); *Davis v. Washington*, 547 U.S. 813, 833 (2006).

Based on this record, the trial court properly found that Jurden was unavailable due to wrongful procurement. The

United States Supreme Court has not set the standard by which the prosecution must demonstrate wrongful procurement. *Davis v. Washington*, 547 U.S. 813, 833 (2006). The Second Circuit, however, has established that the prosecution must prove that the defendant wrongfully procured a witness's absence by a preponderance of the evidence. *Cotto*, 331 F.3d at 235. This is a less stringent standard than the one the prosecution must meet in a *Sirois* hearing, meaning that "a court's finding of admissibility under New York's higher standard, if correct, also satisfies the constitutional standard." *See, e.g.*, *Tatum v. Lempke*, 481 F. App'x 659, 662 (2d Cir. 2012). Additionally, there is no prohibition against marshalling circumstantial evidence to prove wrongdoing for purposes of the Confrontation Clause. *See id.*

The trial court conducted a *Sirois* hearing and heard evidence that petitioner intimidated Jurden, that petitioner proposed a plan to Jurden that she feign a memory lapse, and that Jurden ultimately appears to have adopted this plan. Petitioner's intimidation of Jurden certainly appears to have evidenced a design to procure her silence. Also, the trial court heard evidence that petitioner continued to harangue others about Jurden's testimony well after it became clear that there would be a retrial. Even if the trial court did not rely on this latter evidence of petitioner's conversations with his

mother and ex-girlfriend, the inference that petitioner intended to, and ultimately did, procure Jurden's silence is evident in Jurden's adoption of petitioner's plan that she feign a memory lapse and refuse to testify at the retrial. Furthermore, the defense had an opportunity to cross-examine Jurden at the initial trial. Accordingly, the trial court was not incorrect in finding that admission of Jurden's testimony was appropriate and did not violate the Confrontation Clause. *See Giles*, 554 U.S. at 358 (holding that prior testimony is admissible if the witness is unavailable and the defense had an opportunity to cross-examine the witness on this prior testimony).

Nevertheless, petitioner argues that the trial court's finding of Jurden's unavailability meets the AEDPA standard in two ways: (1) as an "unreasonable application of" well-established federal law under § 2254(d)(1); and (2) as an "unreasonable determination of facts" under § 2254(d)(2). Each of these arguments relies principally on the view that petitioner could not have procured Jurden's absence at the retrial because – at the time of the recorded conversations between petitioner and Jurden – no retrial had been planned. The court will address each of petitioner's arguments in turn.

*First*, petitioner alleges that the trial court's finding that Jurden was unavailable constituted an "unreasonable application of" the United States Supreme Court's wrongful

procurement doctrine under 28 U.S.C. § 2254(d)(1). (Pet'r's Br. at 29.) Petitioner argues the trial court unreasonably applied *Giles*. (*Id.* at 30.) Specifically, petitioner states that he could not have engaged in conduct intended to procure Jurden's silence *at the retrial* as the retrial had not been scheduled at the time of the recorded conversations with Jurden.

The court finds petitioner's argument unavailing. The trial court's finding that petitioner wrongfully procured Jurden's memory lapse is a factual determination entitled to great deference on review. *See, e.g., Geraci v. Senkowski*, 23 F. Supp. 2d 246, 258 (E.D.N.Y. 1998), *aff'd*, 211 F.3d 6 (2d Cir. 2000). Here, the trial court heard evidence that petitioner intimidated Jurden and proposed to her that she feign a memory lapse. As the trial court recognized, this is exactly what happened at the retrial. Given the tone that petitioner took with Jurden during their conversations, and the fact that Jurden later claimed a memory lapse, as proposed, it was reasonable for the trial court to conclude that petitioner continued his efforts to silence Jurden well after it became clear that there would be a retrial. Moreover, even if the trial court did not rely on the other evidence presented, that evidence tended to establish that petitioner continued to urge others, including his mother, to communicate his views to Jurden well after the first trial ended, making clear his intent to silence Jurden at

the retrial.  In light of the foregoing, the trial court was not unreasonable in finding that petitioner sought to procure Jurden's silence at the retrial.

Even if this court were inclined to find that the trial court erred, it would not find that the trial court's error was unreasonable.  It is apparent from the record that petitioner obtained exactly what he sought, *i.e.*, Jurden's lapse in memory.  Despite petitioner's contrary assertions, for instance, that Jurden could have concluded that she did not want to testify on her own, there is clear evidence that petitioner proposed this "lapse in memory" to Jurden.  Given the extensive federal precedent recognizing that the admission of out-of-court statements is appropriate when a defendant has intimidated a witness, and the absence of United States Supreme Court precedent limiting the circumstances that constitute forfeiture by misconduct, this court cannot conclude that the trial court's determination that petitioner wrongfully procured Jurden's absence was an "unreasonable application" of clearly established federal law.  *Cotto*, 331 F.3d at 235.

*Second*, petitioner alleges that the trial court's finding that petitioner intended to procure Jurden's absence at the retrial was an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2).  (Pet'r's Br. at 29.) Specifically, petitioner alleges that "[w]ith the benefit of

hindsight, the court mistakenly assumed that, at the time of the [two conversations with petitioner and his sister], petitioner knew there would be a 'retrial.'" (*Id.* at 29.) This, petitioner says, demonstrates reliance on a "clear factual error" undermining the trial court's determination. *Id.* at 28 (citing *Wiggins v. Smith*, 539 U.S. 510, 528-29 (2003)).

The court has considered petitioner's argument and again finds it unavailing. The trial court properly considered direct and circumstantial evidence. Here, as described above, it is clear that petitioner proposed a plan to Jurden that she feign a memory lapse, that his angry discussions likely intimidated Jurden, and that she ultimately adopted petitioner's plan. From these facts, it was not unreasonable for the court to have determined that petitioner wrongfully procured Jurden's silence. Moreover, the evidence of petitioner's conversations with others established that petitioner's statements were expected to be conveyed to Jurden and affected Jurden's testimony well after it was clear that there would be a retrial. This evidence, even if not relied upon by the trial court, supports the view that the trial court was not unreasonable in finding that petitioner procured Jurden's lapse in memory.

## III. Harmless Error

Finally, petitioner argues that the trial court's determinations were not harmless error. (Pet'r's Br. at 39.)

As the court finds that the trial court did not err in admitting the prior testimony of either Sepulveda or Jurden, it need not reach this question.

## CONCLUSION

Based on the foregoing, petitioner's petition for a writ of habeas corpus is denied in its entirety. Petitioner's claims with respect to the alleged Confrontation Clause violations fail on the merits. The trial court reasonably found that both witnesses were unavailable, rendering their prior trial testimony – which had already been subjected to cross-examination – admissible at the retrial.

Accordingly, the petition for a writ of habeas corpus is denied and dismissed. Because petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability should not be issued. The Clerk of Court is respectfully directed to enter judgment in favor of respondent, serve petitioner with a copy of this Memorandum and Order, note service on the docket, and close the case.

**SO ORDERED.**

Dated:     Brooklyn, New York
           August 23, 2019

/s/ USDJ KIYO A. MATSUMOTO
Hon. Kiyo A. Matsumoto
United States District Judge